B. C. McCOLLUM, Appellant,

v.

J. P. McKELLAR, Appellee.

No. 7205.

Court of Civil Appeals of Texas.

Texarkana.

June 28, 1960.

Supplemental Opinion July 26, 1960.

Kenley, Sharp, Ritter & Boyland, Longview, for appellant.

Fulmer, Fairchild & Badders, Nacogdoches, for appellee.

FANNING, Justice.

This is a suit for personal injuries and for property damage brought by J. P. McKellar against B. C. McCollum, arising from a motor vehicle collision occurring August 19, 1957, in Rusk County, Texas. Defendant admitted his negligence was a proximate cause of the collision. Upon jury trial all damage issues were answered favorably to plaintiff and the trial court entered judgment for plaintiff in the total amount of $74,925, with interest from date of judgment and court costs, from which judgment defendant McCollum has appealed.

Appellant has briefed twelve points of error. By points 1 to 6 inclusive appellant attacks the jury's findings to special issues Nos. 1 and 3, on the grounds of "no evidence", "insufficiency of the evidence", and

that such findings were "against the greater weight of credible testimony". By points 7 and 8 appellant contends that the answers of the jury to special issues Nos. 1 and 3 were "excessive in view of the evidence".

The jury in response to special issue No. 1 assessed plaintiff's damages at $61,895 for physical pain and mental anguish, and loss of earning capacity.

The jury in response to special issue No. 3 assessed plaintiff's damages at $12,500 for future medical expenses.

(In response to other issues not under attack here the jury assessed plaintiff's damages for accrued medical expense at $195, and also found in favor of plaintiff for certain property damages.)

Appellant under his points 1, 2 and 3 makes the following statement:

"Mr. McKellar was involved in a motor vehicle collision on August 19, 1957, when a truck in which he was sitting was struck from the rear by Mr. McCollum's automobile and knocked across an intersection. He offered testimony that his head was thrown backward and against the rear of the cab of the truck (S.F. 75–79). He was hospitalized on two occasions, the day of the accident for a period of twenty-four hours (S.F. 616), and a few days later for a little over three days (S.F. 618). He was seen by Dr. W. E. Gabbert of Rusk, at intervals until the early part of November, 1957 (S.F. 620). Dr. Gabbert was of the opinion Mr. McKellar had suffered a whip lash injury to the neck with some muscle strain (S.F. 624) and should have recovered in from six to eight weeks (S. F. 626). Dr. Wilcox, whose testimony was offered by Plaintiff felt that Mr. McKellar would recover with minimal discomfort (S.F. 437–438) and when he last saw him on May 2, 1958, thought he was able to do carpenter work (S.F. 438). Dr. Ray King, who

was chosen by the attorneys for Mr. McKellar, and whose testimony was offered by him was of the opinion Mr. McKellar had a cervical sprain superimposed on degenerative changes (S.F. 502). He testified Mr. McKellar could do work that did not require him to look up or to work overhead (S.F. 527) without pain (S.F. 531). Dr. Harry W. Slade, also chosen by the attorneys for Plaintiff, and testifying in his behalf, was of the opinion Mr. McKellar had a ruptured cervical intervertebral disc (S.F. 177). None of the doctors found any evidence of fracture of any of the bones in the neck.

"Dr. Wilcox recommended a Queen Anne collar which Mr. McKellar has worn almost continuously since November, 1957, (S.F. 112). Mr. McKellar complained of headaches, neck pain, numbness in portions of his arms, pain in his hips, and dizziness from the time of the accident to the time of trial. Mr. McKellar complained of weakness in his right arm and hand and testified he had been unable to work since the accident (S.F. 127–129). Dr. Slade classified Mr. McKellar's pain as moderate (S.F. 176–181). The only lay witnesses who testified as to the Plaintiff's disability and pain since the accident were his wife (S.F. 550–564) and daughter (S.F. 587–597).

"In his petition, Plaintiff sought $124,500.00 in his prayer for relief (Tr. 4). Specific allegations pertaining to damages consisted of allegations of permanent physical and mental pain, with no amount alleged, permanent loss of earning capacity of $100.00 per week and a life-expectancy of 22.12 years at the time of the accident, past medical of $400.00, future medical in an unknown amount, and $500.00 property damage (Tr. 2–3). The Plaintiff had one year of college and the courses he studied were of no benefit to him now (S.F. 44–45). He was a carpenter

and painter by trade and a considerable amount of his work had been as a boxmaker (S.F. 60). Although he testified as to various wage-rates (S.F. 62, 66, 67), the Plaintiff had no recollection of the wages earned for any one year prior to the accident (S.F. 601). Income tax returns for the years 1950 through 1957 showed personal earnings in an aggregate amount of $7,216.15, or an average of $942.00 annually (S.F. 682–716).

"The jury awarded $61,895.00 damages for physical pain and mental anguish and loss of earning capacity (Tr. 19–20)."

Appellee in his brief in reply to points 1 to 3, inclusive, challenges appellant's statement under points 1 to 3, incl., as being incomplete and incorrect in many respects. Appellee's reply statement contains 22 pages and obviously is too long to quote here but same is here referred to for appellee's version of the matter. In this statement, appellee points out that he was stopped in his pick-up truck at an intersection waiting for the red traffic light confronting him to change to green, when he was struck from the rear by a Buick automobile driven by McCollum travelling at a speed of approximately 70 miles per hour, with the pick-up truck being knocked a distance of 70 to 100 feet against a steel post set in concrete; that McKellar was rendered temporarily unconscious and taken to the hospital. A large bump or knot on the back of McKellar's head was observed and was described as being as large as a hen egg or a tea cup. He testified as to various sums of wages made by him as a carpenter, boxmaker, painter, cattle raising, dairying, farming, etc. He testified in great detail as to his various pains and suffering and as to what had been done for him by the various doctors who examined and treated him, telling of the steel neck brace first put on him and later of the "Queen Anne's Collar" that was put on him and which he was wearing at the trial. His complaints of pain were very severe and were also varied, ranging from the neck, where apparently the greater pain existed or was complained of, to complaints indicating a ruptured cervical disk, to pains and numbness in his right arm, the back of his right hand and three fingers on his right hand. He also complained of loss of vision, loss of smell, and of severe and almost constant headaches. He also complained of trouble with his right hip. He testified further that before the collision his right arm and shoulder were larger than the left, but since the collision they have become much smaller. He further testified that he had not done and had not been able to do any work since the collision. Lay witnesses corroborated him with respect to his appearance being worse after the accident than before the accident, and also testified as to his numerous subjective complaints of various pains.

The medical testimony in the case was in some respects similar and in other respects conflicting. Dr. Gabbert, (placed on the stand by defendant) the first doctor to see and treat McKellar, took X-rays of McKellar's neck and found nothing abnormal in the bony pathology of the cervical vertebra. He put McKellar in a neck brace and kept him in the hospital until the following morning. The day after McKellar went home he returned to the hospital and stayed three days. Dr. Gabbert's impression was that McKellar had a whiplash injury to the neck with probably some muscle and fascial strain or tearing. He saw no objective symptoms of injury other than muscle spasm in the neck, and he did not recall seeing the large knot on the back of McKellar's head that lay witnesses saw and testified to. Because of McKellar's subjective complaints he sent McKellar to Dr. Wilcox in Tyler. Dr. Gabbert's impression was the same as that entertained by Dr. Wilcox after Wilcox's first examination of McKellar, that McKellar would probably recover completely in six to eight weeks.

The deposition of Dr. Wilcox was taken by defendant and plaintiff cross-examined Dr. Wilcox in said deposition. Certain portions of Wilcox's deposition were introduced in evidence. On October 30, 1957, his X-rays of McKellar's neck showed a straightening of the normal lordotic curve. He also heard all the subjective complaints that were given to him by McKellar at that time. We quote from appellee's brief on pages 11 and 12 with respect to appellee's further analysis of Dr. Wilcox's testimony as follows:

"* * * He diagnosed McKellar's condition as a myofascial strain, by which he meant a tear, either large or small, of the muscles, and the supporting tissues including the ligaments and tendons, and his prognosis, 'guess as to what is going to happen' was that McKellar would recover in six to eight weeks. (428.)

"On February 14, 1958, he did not reexamine McKellar, but prescribed physical therapy, consisting of intermittent head halter traction, with heat, massage, and active motions of the cervical region. On October 30, he had prescribed a Queen Anne's collar support for McKellar. (428, 430.)

"His examination on May 2, 1958, revealed that McKellar's condition was essentially unchanged. X-rays he took on this date, May 2, 1958, revealed nothing different from that which was revealed by the x-rays taken on October 30, 1957. (431–433, 446.)

"At the time of his examination on May 2, 1958, he felt that 'functionally' McKellar was able to do some forms of work. (438.) By that he means so far as the mechanical ability to move the portions of his body is concerned. McKellar has no disturbance of function; but this statement is made without reference to pain, and he did not attempt to evaluate McKellar's ability to work as it might be affected by the pain the movements of his body would cause. When he says McKellar is functionally able to work, he lays aside all consideration save the actual motor ability to move. (475–476.)

"Though at the outset he thought McKellar would recover from the injury in all probability in six to eight weeks, McKellar did not do so, and consequently, when he saw him last, on May 2, 1958, he was compelled to revise his estimate of the probable duration of McKellar's disability, so that at that time, he really had no definite idea about how long the injury would last. He has not expressed the view that McKellar would ever get over this myofascial strain completely. He would expect him probably to suffer some degree of disability as a result of the injury from now on out, and the exact extent of that he is unable to predict. (470–471.)

*    *    *    *    *    *

"McKellar's headaches may be accounted for by damage to the nerves of the autonomic system going up into the brain from the neck, or by injury to the brain itself. His blackouts may be due to his pain. (462–464.) The injury McKellar is suffering with, in his opinion, is such as would be expected to cause McKellar to suffer pain; he expected pain when he saw the flattening of the lordotic curve. (477.)

"From the time of his first examination of McKellar, McKellar's condition remained essentially the same. (482.) And since he has not seen McKellar since May 2, 1958, he is not prepared to express an opinion as to McKellar's condition since that time. (487.)"

■ Dr. Ray E. King, an orthopedic surgeon of Shreveport, Louisiana, testified by deposition taken by plaintiff and Dr. Harry Warren Slade, a neurosurgeon of

Waco, Texas, testified as a witness for plaintiff. The testimony of these doctors was very strongly in favor of plaintiff, and appellee's analysis of their testimony is contained on pages 14 to 21, inc., of appellee's brief and is too long to quote here. This evidence however, is amply sufficient to support a finding of serious permanent disability on the part of appellee to earn money and would virtually support a finding of total and permanent disability or something very near that. This testimony would also corroborate and support the view that appellee's complaints of pain were severe to moderate, and severely to moderately disabling. Dr. Slade also was of the opinion that Mr. McKellar had a ruptured cervical disk in addition to his other multiple injuries and complaints, and that an operation and hospitalization therefor would cost approximately $700, and that he could not guarantee that the operation would be successful or that it would relieve Mr. McKellar's situation.

Dr. Slade was of the further opinion that the reasonable cost of Mr. McKellar's future medical expenses would be $40 or $50 per month for the rest of his life.

Appellee on page 9 of his brief states with reference to Mr. McKellar's income tax returns for the years 1950 through 1957, inclusive, as follows:

"McKellar's income tax returns for the years 1950 through 1957, inclusive, introduced in evidence, reflect that he reported income during these years as follows:

"1957—$664.90
"1956—$302.25 (McKellar testified he worked on his house most of that year.) (675.)
"1955—$545.75 ($431.75 + $114.00)
"1954—$1,182.25 (Income from self-employment of $1,003.93, plus wages of $151.12 and $27.20)
"1953—$1,336.51 ($1,288.51 + $48.-00)

"1952—$1,688.75
"1951—$1,644.10 ($141.60 + $762.33 + farm profit of $740.17.
"1950—$1,798.73 ($1,211.03 + farm profit of $587.70) (682–716.)"

There was testimony to the effect that McKellar's father lived to be 78 and that his mother still living was 78 or 79. McKellar at the time of the injury was 50 years of age and had a life expectancy of 22.2 years. Dr. Slade testified to the effect that McKellar would probably live 27 years longer.

Appellant in his brief on page 8, states that the annual average of plaintiff's earnings as shown by his income tax reports from 1950 through 1953 was $942 annually. Appellant in his brief, using the figure of $942 as appellee's annual earnings, takes the position that certain discounts for cash payment of damages were allowable, and reaches the conclusion that the evidence would not support a finding in excess of $15,862 for loss of earning capacity (see page 12 of appellant's brief). Appellee in his brief on page 39 contends to the effect that McKellar's earning capacity was greater than shown by his previous income tax reports, and that his earning capacity was to be properly estimated on the basis of his experience and training and abilities to earn money, rather than solely upon the basis of what he may have earned over a few years immediately prior to his injury. It is appellee's position as shown in his brief on page 40 thereof that under the evidence the jury was entitled to believe that the earning capacity of a man of McKellar's experience and abilities and attitudes was in excess of $1,500 per year. Appellee sums up his position in this respect, after quoting various figures, on page 41 of his brief, as follows:

"We respectfully submit that the jury, under the record in this case, would have been well authorized to determine that the damages to be assessed for McKellar's lost earning capacity

as a result of his injuries should be substantially in excess of $25,000.00."

If appellee is correct that the evidence will support a verdict of at least $25,000 for loss of earning capacity, that amount subtracted from the sum of $61,895 would leave the sum of $36,895 assessed for physical pain and suffering and for mental anguish. If appellant's figures of $15,862, or another figure less than $25,000 was deemed to be the correct amount allowable for loss of earning capacity, then the damages for physical pain and suffering and mental anguish would be in excess of $36,-895. At any rate, irrespective of the conflicting theories of the parties with respect to the amount supportive for loss of earning capacity, it is apparent that the greater bulk of plaintiff's award of $61,895 on special issue No. 1 would be for pain and suffering and for mental anguish.

Appellee in his excellent brief persuasively argues that Mr. McKellar's complaints of severe pain, corroborated by lay witnesses and particularly corroborated by Drs. Slade and King, and the evidence as a whole, would amply support a large award for pain and suffering and for mental anguish.

We have reached the conclusion that there is evidence of probative force to support the jury's findings to special issues Nos. 1 and 3, and that the evidence is sufficient to support such findings.

Furthermore we have carefully reviewed all of the evidence in the case in the light of the rules announced by the Supreme Court of Texas in the case of In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, and are of the opinion that the findings of the jury in response to special issues Nos. 1 and 3 are not so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

Appellant's points 1 through 6, inclusive, are respectfully overruled.

Rule 440, Texas Rules of Civil Procedure, provides as follows:

"In civil cases appealed to a Court of Civil Appeals, if such court is of the opinion that the verdict and judgment of the trial court is excessive and that said cause should be reversed for that reason only, then said appellate court shall indicate to such party, or his attorney, within what time he may file a remittitur of such excess. If such remittitur is so filed, then the court shall reform and affirm such judgment in accordance therewith; if not filed as indicated then the judgment shall be reversed."

The Supreme Court of Texas in the case of Dallas Ry. & Terminal Co. v. Farnsworth, 148 Tex. 584, 227 S.W.2d 1017, 1122, in construing Rule 440, T.R.C.P., supra, stated in part as follows:

"The rule contains no language suggesting that when the Court of Civil Appeals is of the opinion that the verdict of the trial court is excessive and that the cause should be reversed for that reason only, it cannot require remittitur unless it finds in the record evidence other than that afforded by the amount of the verdict that the jury in fixing the amount was influenced by passion or prejudice. We believe that under this rule a Court of Civil Appeals may require remittitur when, after consideration of the amount of the verdict and the evidence bearing upon the amount, it finds that the verdict is excessive and that the cause should be reversed for that reason only. The amount of the verdict itself, when considered in the light of the evidence in the record, may be enough to convince the Court of Civil Appeals that it was the result of passion or prejudice or other improper motive or was in disregard of the evidence. In our opinion there need not be extraneous proof of passion or prejudice on the part of the jury. Indeed, it

would be in many cases very difficult and often impossible to make that proof. The foregoing conclusions find support in Judge Martin's opinion, adopted by the Supreme Court, in World Oil Co. v. Hicks, 129 Tex. 297, 103 S.W.2d 962."

 Having considered the myriad factors involved in this case and in the exercise of the duties enjoined upon this court under Rule 440 T.R.C.P., supra, it is our conclusion that the jury's answers to special issues Nos. 1 and 3 are each manifestly too large and are each excessive. It is found by us that the answers to issues Nos. 1 and 3 are in the aggregate excessive by the sum of $20,000. It is found by us that the evidence will support a verdict and judgment in the sum of $54,925, and that the judgment of the trial court is excessive by $20,000.

Appellant's points 9, 10, 11 and 12 have been carefully examined, are deemed as not presenting reversible error under the record in this case, and are respectfully overruled.

Having found the judgment to be excessive by the sum of $20,000, it becomes the duty of this court, therefore, to order that the case be reversed and remanded for new trial unless within fourteen days after the date of this opinion the appellee files a remittitur of $20,000.

### Supplemental Opinion

The supplemental opinion of July 19, 1960 is withdrawn and the following supplemental opinion is substituted in lieu thereof:

On July 7, 1960, appellee filed a remittitur of $20,000 in compliance with the suggestion of remittitur in the original opinion of June 28, 1960. The judgment of the trial court will be reduced by the amount of the remittitur and as so modified is affirmed with the costs taxed as hereinafter outlined.

In view of the fact that the judgment of the trial court has been reduced by remittitur as above outlined, and the cause affirmed as modified, in our best discretion viewing the record as a whole in this cause, it is our opinion that it would be just and equitable to tax three-fourths of the costs in this cause (both in the court below and in this court) against the appellant, and that one-fourth of such costs should be taxed against the appellee.

Affirmed as modified and the costs are taxed in accordance with this opinion.